IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| POTENCIANO L. AGGARAO, JR. | * | |
| | * | |
| | * | |
| | * | |
| v. | * | Civil No. CCB-09-3106 |
| | * | |
| | * | |
| MOL SHIP MANAGEMENT CO., LTD., | * | |
| et al. | * | |

******

## MEMORANDUM

Plaintiff Potenciano Aggarao, a citizen of the Philippines, brought this lawsuit against

defendants MOL Ship Management Co., Ltd., Nissan Motor Car Carrier Co., Ltd., and World

Car Carriers, Inc. (collectively, "the Vessel Interests") after he sustained severe injuries aboard

the M/V Asian Spirit.[1]  On September 30, 2010, this court dismissed Mr. Aggarao's complaint

for improper venue, reasoning that, pursuant to the Philippine Overseas Employment

Administration Contract of Employment ("the POEA Contract"), his exclusive remedy against

the Vessel Interests was arbitration in the Philippines.[2]

Mr. Aggarao filed a timely notice of appeal and, on March 16, 2012, the Fourth Circuit

issued an opinion affirming in part, vacating in part, and remanding.  The Fourth Circuit, while

affirming the court's conclusion that Mr. Aggarao must arbitrate his claims against all the Vessel

Interests, rejected its procedural disposition of the case.  The Fourth Circuit explained that the

_____

[1] The Vessel Interests managed, chartered, and owned the Asian Spirit, respectively.  MOL was Mr. Aggarao's employer.

[2] Mr. Aggarao entered into the POEA Contract on June 2, 2008.  The POEA Contract was developed by the Philippine government to help ensure minimum employment standards for Filipino seamen employed by foreign corporations, and it included a mandatory arbitration clause.  Although only MOL was a signatory to the POEA Contract, Mr. Aggarao was equitably estopped from pursuing in federal court his separate claims against Nissan and World Car.

court should not have dismissed the case once it deemed Mr. Aggarao's claims to be arbitrable.

Instead, the court was obliged to retain jurisdiction pending the outcome of the arbitration

proceedings, as Mr. Aggarao may challenge his arbitration award under the Convention on the

Recognition and Enforcement of Foreign Arbitral Awards ("the Convention" or "the New York

Convention").  In this way, the Fourth Circuit explained, the court may ensure that his arbitration

award comports with the public policy of the United States.  Thus, the Fourth Circuit remanded

the case with instructions to enter a stay pending the outcome of arbitration.[3]

Pursuant to the Fourth Circuit decision, on June 20, 2012, this court directed Mr. Aggarao

to initiate arbitration in the Philippines within sixty days.  Mr. Aggarao complied with the order

and filed a complaint with the Philippine National Labor Relations Commission ("NLRC").

Leading up to Labor Arbiter Romelita N. Rioflorido's decision, six mandatory conferences were

scheduled between September 2012 and January 2013.  Both sides filed position papers and

memoranda in reply, and hearings were held on March 19, 2013, and April 4, 2013.  The arbiter

rendered a decision on April 25, 2013.[4]

Now pending before the court are Mr. Aggarao's motion to vacate the Philippine

arbitration decision[5] and, conversely, the Vessel Interests' motion to confirm that decision.  The

---

[3] Additionally, the Fourth Circuit vacated the court's denial of Mr. Aggarao's motion for preliminary injunction, directing that it consider his request for maintenance and cure while arbitration was pending.  The parties agreed, however, that Mr. Aggarao's renewed motion for preliminary injunction was rendered moot by the arbitration decision, which was made after the parties briefed the renewed motion but before the court held a hearing on it.  Accordingly, on July 9, 2013, Mr. Aggarao's motion was denied as moot.

[4] Mr. Aggarao did not appeal the arbiter's decision.  He later filed an impermissible motion for reconsideration, which the arbiter denied.

[5] Although Mr. Aggarao moves to vacate the Philippine arbitration award, the court is only empowered to refuse to recognize and enforce a foreign arbitration award.  *See* Convention, art. V(1) (emphasis added) ("*Recognition and enforcement of the award may be refused*, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, [the appropriate] proof . . . ."); *id.*

issues in this case have been fully briefed, and a hearing was held on July 14, 2014.  For the reasons stated below, the court will grant Mr. Aggarao's motion and deny the Vessel Interests' motion.

## BACKGROUND

Mr. Aggarao, who continues to suffer serious medical problems related to injuries sustained aboard the Asian Spirit, is back before this court after the arbiter decided that the POEA Contract entitled him to $89,100 in disability benefits and 240 days of "sick pay."  The relevant facts are provided below.

### A. **Mr. Aggarao's Accident and Its Continuing Repercussions**[6]

On August 13, 2008, the M/V Asian Spirit, a Liberian-flagged vessel, was in the Chesapeake Bay heading towards the Port of Baltimore, where it was scheduled to load a cargo of motor vehicles.  Mr. Aggarao was assigned to raise floor panels within the ship in preparation for loading cargo.  As his crew began raising certain floor panels, Mr. Aggarao was crushed between a pillar inside the ship and a mobile deck lifting machine.  He suffered severe chest, spinal, and abdominal injuries, and was airlifted to the University of Maryland Shock Trauma

---

(V)(2) (providing additional grounds for refusal to recognize and enforce a foreign arbitration award); *see also* 9 U.S.C. § 207 (emphasis added) ("The court shall confirm [a foreign arbitration] award unless it finds one of the grounds for *refusal or deferral of recognition or enforcement of the award* specified in the . . . Convention.").  To the extent Article V contemplates vacatur of a foreign arbitration award, it contemplates that the "competent authority of the country in which . . . [the] award was made" may set aside the award.  *See* Convention, art. V(1)(e); *see also Zeiler v. Deitsch*, 500 F.3d 157, 165 n.6 (2d Cir. 2007) (explaining that neither the Convention nor its enabling statute gives the district court power to vacate a foreign arbitration award, rather the court should refuse to enforce the award); *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 849 (6th Cir. 1996) (reasoning that, under the Convention, a motion to vacate a foreign arbitration award "may be heard only in the courts of the country where the arbitration occurred or in the courts of any country whose *procedural* law was specifically invoked in the contract calling for arbitration of contractual disputes").

[6] The facts relating to Mr. Aggarao's injuries and treatment are thoroughly summarized in the Fourth Circuit's opinion, *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355 (4th Cir. 2012). They are repeated and brought up to the present date in this Memorandum.

Center, where Dr. Thomas Scalea performed emergency surgery for ligation of vessels, bowel resection, and splenectomy.  Facing infections and multiple complications, Mr. Aggarao endured many additional surgeries in just the next few weeks.

On October 15, 2008, he was transferred from the Shock Trauma Center to Kernan Rehabilitation Hospital for follow-up treatment, including physical and occupational therapy in the spinal cord unit.  Mr. Aggarao presented to Kernan with "T4 ASIA A paraplegia with complete paralysis."  (Nov. 18, 2008, Henry York Letter, Ex. 12F, ECF No. 132-14, at 1.)  He had no bowel or bladder control.  Dr. Henry York, Mr. Aggarao's physician at Kernan, reported in November 2008 that he had "made excellent progress towards his goals of independent functional mobility."  (*Id.*)  In particular, Mr. Aggarao was "independent in bed mobility" and was able to transfer himself between his bed and his wheelchair.  (*Id.*)  Dr. York contemplated that, with "further physical therapy, Mr. Aggarao's functioning mobility skills will continue to improve."  (*Id.*)  He also recommended that Mr. Aggarao acquire an "ultra-lightweight wheelchair" so that he could achieve optimal mobility when he returned to the Philippines.  (*Id.* at 2.)

According to a June 4, 2010, declaration of the Vessel Interests' paralegal, Dr. York and a physical therapist agreed at a meeting on December 4, 2008, that Mr. Aggarao "had reached as full a recovery as Kerman Hospital could provide him," "was able to care for himself," and "was ready for the trip to the Philippines."  (Decl. of Paul R. Fuhrman, Ex. 2, ECF No. 66-3, ¶¶ 14–18.)  Believing that he had completed his course of rehabilitation, the Vessel Interests wrote to Mr. Aggarao on December 8, 2008.  They informed Mr. Aggarao that the owners and insurers of the Asian Spirit had authorized travel arrangements for his return to the Philippines.  Additionally, they indicated that they had "not been authorized to arrange for any further medical

care . . . in this country, or to incur additional medical costs on behalf of the ASIAN SPIRIT and

her Owners and Insurers, after [his] discharge . . . from Kernan Hospital." (Dec. 8, 2008, M.

Hamilton Whitman Letter, Ex. 12G, ECF No. 132-14, at 2.) Fearing that he would not receive

adequate medical treatment in the rural area of the Philippines in which his family lived and that

he would die, Mr. Aggarao declined to be repatriated.

The Vessel Interests reiterated on February 11, 2009, that they would arrange for Mr.

Aggarao's prompt repatriation, and indicated that he "must return to The Philippines for further

medical care, as required by the POEA Contract." (Feb. 11, 2009, Whitman Email, Ex. 11, ECF

No. 45-36.) They further stated that they "intend to honor their obligations under the POEA

contract, including those obligations that will continue after [Mr.] Aggarao returns to The

Philippines," although they did not specify what those obligations were. (*Id.*)

On February 25, 2009, Mr. Aggarao was discharged from Kernan, which had arranged to

pay, for seven days only, the costs of his room and board at a nearby Days Inn hotel. Kernan

also made arrangements for a home health care nurse to make daily visits during those seven

days. After the seventh day, the cost of room and board became Mr. Aggarao's responsibility.

His family sent him money to pay for the room, but he had to rely on other family members and

friends in the Filipino community to provide him with meals.

On March 11, 2009, Mr. Aggarao wrote to the Vessel Interests, explaining that,

notwithstanding his course of rehabilitation at Kernan, Dr. Scalea, his trauma surgeon, had

recommended that he remain in the United States for abdominal reconstructive surgeries. He

forwarded to the Vessel Interests a letter from Dr. Scalea, which stated:

> I have been caring for Potenciano Aggarao since his injury date on August 13,
> 2008. . . . . In my opinion, the ideal therapy for this patient is staged abdominal
> wall reconstruction. . . . . This is a highly complicated situation and I believe it is
> in Mr. Aggarao's best interest to remain in the United States to have the

> procedures done at the Shock Trauma Center.  This is a procedure which is best
> done in a tertiary care facility.  More importantly, I believe that optimal results
> will occur if he is cared for in an institution that knows him inside and out.

(Mar. 10, 2009, Scalea Letter, Ex. 12L, ECF No. 132-14, at 1.)  Mr. Aggarao asked for a

commitment from the Vessel Interests to pay for Dr. Scalea's treatment until he reached

"maximum medical improvement."  (Mar. 11, 2009, Joseph Moschetta Letter, Ex. 12K, ECF No.

132-14, at 2.)

By April 2009, Mr. Aggarao, having received no response from the Vessel Interests,

could no longer afford to stay at the Days Inn.  He lived for about a month with Norman

Alegiogo, who let him stay on the first floor of his house, and eventually moved in with Aurora

Bautista, who helped him take his medication, change and dispose of his catheter and colostomy

bags several times a day, wash his clothes, bathe, and attend church and  his doctor

appointments.  Mr. Aggarao returned to the University of Maryland hospital on April 15, 2009,

where he presented to the outpatient clinic with a five-day history of constipation.  He was

prescribed a number of medications, but could only afford to have the prescriptions partially

filled.  On April 17, 2009, Mr. Aggarao reiterated his request to the Vessel Interests "to pay all

future medical expenses for [his] treatment in Baltimore, Maryland, until he achieves maximum

medical improvement."  (Apr. 17, 2009, Moschetta Letter, Ex. 12O, ECF No. 132-14, at 1.)  At

that time, his unpaid medical bills and other debt totaled well over a million dollars.

Mr. Aggarao contacted the Vessel Interests again on April 29, 2009, this time to inform

them that he was running out of his medication and that he did not have any money to refill

them.  The Vessel Interests responded the next day; they did not offer to pay for his medication,

although they indicated that they had arranged with Future Care, Inc. to monitor Mr. Aggarao's

medical condition.  On May 7, 2009, Mr. Aggarao still had not filled all his prescriptions, and he

returned to the University of Maryland hospital, where he was admitted for kidney infection.

The next day, the Vessel Interests agreed to pay $485.51 for Mr. Aggarao's prescription

medication, but only if he agreed to accept repatriation within 15 days. The Vessel Interests

indicated that they were "fully prepared to comply with their obligations under the POEA

Contract and Philippine law," and that it was their position that they were "required to pay for

Mr. Aggarao's continued medical care in the Philippines." (May 8, 2009, Whitman Letter, Ex.

12U, ECF No. 132-14, at 1.) If, however, Mr. Aggarao would not accept repatriation, "the cost

of his medical care in [the United States] will continue to be for his own account." (*Id.* at 2.)

Mr. Aggarao again refused to be repatriated and initiated this litigation on June 16, 2009.

Shortly after Mr. Aggarao filed his complaint in this matter, on June 29, 2009, the Vessel

Interests settled Mr. Aggarao's unpaid hospitalization and medical bills in the amount of

$944,530.99. The Vessel Interests thereafter told Mr. Aggarao that they "remain ready and

willing to arrange appropriate transportation for [him] to return home to the Philippines, as well

as to provide further appropriate medical care in that country in accordance with the employment

contract and Philippine law." (July 1, 2009, Whitman Letter, Ex. 12Y, ECF No. 132-14, at 1.)

Mr. Aggarao, however, has remained in the United States and has received virtually[7] no financial

assistance from the Vessel Interests since June 29, 2009, a period of over five years.

Mr. Aggarao continued to accrue substantial medical bills and other debt as he went in

and out of hospitals in Maryland for additional surgical procedures and related, serious

complications. He was set to undergo staged abdominal wall reconstruction in July 2009, but the

surgery was delayed when he was forced to undergo weekly skin expansion procedures between

---

[7] The Vessel Interests, upon learning that Mr. Aggarao's desperate financial straits forced him to reuse colostomy bags and catheters, offered to pay for those supplies on a monthly basis. (*See* Nov. 29, 2012, Carla Murphy Letter, Ex. 3, ECF No. 121-9.)

August and October 2009.  In an October 30, 2009, report, Dr. Ana Acevedo, who performed an independent medical examination on Mr. Aggarao at the request of his counsel, agreed that he needed further abdominal reconstruction surgery, and determined that he "will need appropriate and diligent medical care for the rest of his life" and that he was "unlikely [to] have the expert medical care that he needs" if he returned to his "small village in the Philippines."  (Oct. 30, 2009, Acevedo Rep., Ex. 12LL, ECF No. 132-15, at 13.)  On January 5, 2010, Dr. Scalea performed the first of two planned abdominal reconstructive surgeries on Mr. Aggarao.  Mr. Aggarao was discharged from the hospital on January 9, 2010, but was rushed back to Shock Trauma just two days later due to complications from his surgery.  From the hospital, he was discharged to a homeless shelter.  Ms. Bautista retrieved Mr. Aggarao from the homeless shelter within a few days, but shortly thereafter in February 2010 he was forced to return to the hospital so that Dr. Scalea could perform another surgical procedure on a bed sore that had developed.

Despite Dr. Scalea's treatment, Mr. Aggarao's medical problems continued through 2010, during which time his sacral wound became infected and required surgery on November 29, 2010.  During that year, Mr. Aggarao was also diagnosed with a urinary tract infection and with chronic renal insufficiency.  In a 2010 report, Dr. Richard Bonfiglio, retained by the plaintiff, opined that Mr. Aggarao needed "extensive, ongoing daily, medical, and rehabilitative care" and that he "would not be able to receive the level of medical care that he needs in other countries, especially the Philippines."  (Apr. 19, 2010, Bonfiglio Rep., Ex. 17D, ECF No. 132-24, at 5.)[8]  Mr. Aggarao's medical records reveal that, in 2011, he was diagnosed with an

_____

[8] But Dr. Natalio G. Alegre, a general surgeon practicing at St. Luke's Medical Center in Manila and the Vessel Interests' designated physician during later arbitration proceedings, reviewed Mr. Aggarao's medical records and determined that "[h]is medical, surgical, rehabilitative and psychiatric needs can all be handled in the Philippines" and that it was safe for him to travel there from the United States.  (May 27, 2010, Alegre Decl., Ex. 1, ECF No. 121-1, ¶ 5E.)

atrophic left kidney and suffered additional urinary tract infections, as well as heart palpitations, pulmonary embolisms, insomnia, and depression.  He had another surgery on his sacral wound on May 27, 2011.  In early 2012, Mr. Aggarao was diagnosed with a hernia at the site of the colostomy and, as of October 22, 2012, was experiencing frequent urinary and fecal incontinence, lower back pain which he rated as an eight on a scale of zero to ten, spasms in both lower limbs, and pressure ulcers which required cleaning every three days.[9]

In February 2013, Dr. Bonfiglio detailed Mr. Aggarao's continuing needs and what would happen if he did not receive the necessary treatment.  Dr. Bonfiglio explained that Mr. Aggarao requires Gabapentin to manage neuropathic pain, Baclofen to prevent increased spasticity, Oxbutynin to maintain bladder functioning and prevent incontinence, Protinix to manage stomach acid and prevent abdominal discomfort, Oxycodone to manage pain, Ambien to facilitate sleep, and Biscodyl and Mytab Gas to prevent severe constipation and bowel accidents.  In addition, he needs adult diapers, colostomy bags, and catheters.  Finally, Mr. Aggarao needs a new wheelchair to prevent sacral wounds and physical therapy to strengthen his upper body.  (*See* Feb. 15, 2013, Bonfiglio Supp. Rep., Ex. 14, ECF No. 132-20, at 5–11.)

Since Dr. Bonfiglio's 2013 report, Mr. Aggarao has continued to require significant medical care.  On January 24, 2014, he reported constant pain and continued problems with incontinence.  Mr. Aggaro was hospitalized at Mercy Medical Center from February 21, 2014, to March 3, 2014, during which time he was treated for recurrent pulmonary embolisms.  From May 14, 2014, to May 17, 2014, he was hospitalized again after suffering from diarrhea for two days.  Mr. Aggarao was diagnosed with a C-diff bacterial infection, as well as a urinary tract

---

[9] In December 2012, Dr. Alegre again reviewed Mr. Aggarao's medical records and also conducted a physical examination.  Dr. Alegre concluded that "[w]ithout doubt, Mr. Aggarao can be repatriated to the Philippines now" and that "further medical management is available and adequate in the Philippines."  (Dec. 5, 2012, Alegre Rep., Ex. 39, ECF No. 112-5, at 5.)

infection and other problems related to his paraplegia.  On June 10, 2014, Mr. Aggarao presented

to the emergency room at Mercy with kidney infection.

As of the date of his motion to vacate, Mr. Aggarao owed about $761,000 to the

University of Maryland Hospital and over $4,700 to the Injured Workers Pharmacy.  He owed

about $33,000 to Ms. Bautista and almost $65,000 to Mr. Alegiogo.  He had borrowed another

$3,575 to pay for his stay at the Days Inn in March and early April 2009.  Due to his severe

financial constraints, he has been forced to forego necessary treatments, including medications

and physical therapy.  He has been forced at times to reuse colostomy bags and catheters, and

has been unable to purchase a new wheelchair.  Mr. Aggarao will require special care for the rest

of his life and, based on the arbitration decision, must bear the vast majority of the associated

tremendous costs without additional assistance from the Vessel Interests.

### B.  Arbitration Decision

The arbiter's April 25, 2013, decision purported to address Mr. Aggarao's claims for

unpaid wages and contractual compensation benefits, lost future wages, maintenance and cure,[10]

moral and exemplary damages, and attorney's fees and interest.[11]

As a preliminary matter, the arbiter determined that U.S. law did not apply to any of the

above claims, citing both Section 10 of Philippine Republic Act No. 8042 and the POEA

Contract.  As quoted by the arbiter, Section 10 of Republic Act No. 8042 stated that labor

arbiters of the NLRC are to have "original and exclusive jurisdiction to hear and decide . . .

claims arising out of any employer-employee relationship or by virtue of any law or contract

---

[10] "Maintenance is the right to sustenance and unearned wages for the period from the onset of the injury to the end of the voyage; cure is the right to medical care until the seaman reaches the point of maximum cure."  *Martin v. Harris*, 560 F.3d 210, 221 (4th Cir. 2009).
[11] Mr. Aggarao made the above claims against Magsaysay Mistsui OSK Marine, Inc., Conrado N. Dela Cruz, MOL, World Car, and Nissan.  Acting as an agent for MOL, Magsaysay entered into the POEA Contract with Mr. Aggarao.  Dela Cruz was an officer of Magsaysay.

involving Filipino workers for overseas deployment including claims for actual, moral,

exemplary and other forms of damages." (Arbitration Decision, Ex. 18, ECF No. 132-25, at 5.)

Section 31 of the POEA Contract further provided that "[a]ny unresolved dispute, claim or

grievance arising out of or in connection with this Contract . . . shall be governed by the laws of

the Republic of the Philippines, international conventions, treaties and covenants where the

Philippines is a signatory." (POEA Contract, Ex. 8, ECF No. 132-9, at 3.) Noting that there was

"no question" that Mr. Aggarao's claims against MOL stemmed from their employment

relationship, the arbiter reasoned that the claims against Nissan and World Car would not have

existed had the employment-related accident not occurred. (Arbitration Decision at 4–5.) In

addition to upholding the POEA Contract's choice-of-law provision, the arbiter explained that, in

the absence of proof to the contrary, "foreign law is presumed the same as Philippine law." (*Id.*

at 7.) Thus, according to the arbiter, she could not simply take judicial notice of foreign law;

rather, Mr. Aggarao had the burden of showing that foreign law controlled. (*Id.* at 6–7.)

Because Mr. Aggarao did not provide sufficient proof that U.S. law applied, the arbiter applied

Philippine law to all of his claims against the Vessel Interests. (*Id.* at 7–8.)[12]

Turning to Mr. Aggarao's substantive claims, the arbiter determined that Mr. Aggarao

was entitled to $89,100 in disability benefits based on the assessment of the "company-

designated physician," Dr. Alegre, that he had a "Grade 1 disability." (*Id.* at 8.) According to

the arbiter, Section 20(A)(2) of the POEA Contract indicated that only the company-designated

physician may assess the complainant's disability; thus, absent a showing of bad faith or bias,

this assessment "should be considered as the only basis on whether or not to award disability

---

[12] Mr. Aggarao provided the affidavit of his own counsel to show that U.S. law applied to his
claims, (*see* Joseph Capuyan Decl., Ex. 30, ECF No. 137-6, ¶¶ 12–14), but the arbiter found this
was not sufficient proof that U.S. law controlled, (Arbitration Decision at 7–8).

benefits." (*Id.*; *see* POEA Contract at 2 (emphasis added) ("[I]f after repatriation, the seafarer still requires medical attention arising from said injury or illness, he shall be so provided at cost to the employer until such time he is declared fit or the degree of his disability has been established *by the company-designated physician*.").) Here, the arbiter concluded, there was no showing of bad faith or bias to call into question the physician's assessment, and an award based on Mr. Aggarao's Grade 1 disability assessment constituted "total and permanent disability benefits." (Arbitration Decision at 8–9.)

With respect to Mr. Aggarao's claim for loss of earning capacity, the arbiter found that he "failed to present evidence on the alleged negligence of respondents." (*Id.* at 9.) Accordingly, the arbiter determined that she could not grant any award for loss of earning capacity. (*Id.*)

Citing Section 20(G) of the POEA Contract, the arbiter next held that, in view of the $89,100 judgment, Mr. Aggarao was "no longer entitled to any other claims for damages or compensation in connection" with the injuries he sustained aboard the Asian Spirit. (*Id.* at 10; *see* POEA Contract at 2 ("The seafarer . . . acknowledges that payment for injury, illness, incapacity, disability or death of the seafarer under this contract shall cover all claims arising from or in relation with or in the course of the seafarer's employment, including but not limited to damages arising from the contract, tort, fault or negligence under the laws of the Philippines or any other country.").) Nor was Mr. Aggarao entitled to "additional compensation from the other respondents in this case who are not his employers." (Arbitration Decision at 10.) The arbiter, citing the Philippine Supreme Court's decision in *Joseph v. Bautista*, reasoned that there was a "single wrong in this case" and that Mr. Aggarao was "entitled to a single compensation regardless of the number of respondents he sues." (*Id.* at 10–11.) The arbiter concluded, in sum,

that "[t]he fact remains that [Mr. Aggarao] filed a claim for disability compensation under the POEA Contract and this bars him from claiming any other forms of damages." (*Id.* at 11.)[13]

Pursuant to the POEA Contract, Mr. Aggarao also had no right to maintenance and cure after he refused repatriation. (*Id.* at 13–14.) Section 20(B)(2) of the POEA Contract provided that: "If the injury or illness requires medical . . . treatment in a foreign port, the employer shall be liable for the full cost of such medical . . . treatment as well as board and lodging *until the seafarer is declared fit to work or to be repatriated*." (POEA Contract at 2.) Here, the arbiter explained, because the company-designated physician determined that Mr. Aggarao was fit to be repatriated, the Vessel Interests could not "be required to bear the burden of [his] maintenance and cure in the United States." (Arbitration Decision at 13–14.)

Finally, the arbiter determined that Mr. Aggarao was entitled to "attorney's fees amounting to 10% of the entire judgment," as well as 240 days of sick pay, or $4,512. (*Id.* at 14–15.) As to the latter, the arbiter explained that "[u]nder Philippine laws, a seafarer is . . . considered permanently and totally disabled upon the lapse of 240 days from initial treatment without him gaining the physical capacity to return to work . . . ." (*Id.* at 14.) Thus, Mr. Aggarao was only entitled to sick pay until he was deemed totally and permanently disabled.

Summarizing the award, the arbiter stated that MOL, Magsaysay, and individual respondent Dela Cruz, as "the responsible officer of respondent Magsaysay," were to be held jointly and severally liable for the $89,100 judgment, 240 days of sick pay, and attorney's fees. (*Id.* at 15.) World Car and Nissan, however, were "relieved of liabilities for want of legal and contractual basis," and "[a]ll other claims [were] denied for want of any basis." (*Id.*)

---

[13] Notwithstanding this conclusion, the arbiter also noted that Mr. Aggarao was not entitled to "any award of moral or other forms of damages" because he failed to show that the Vessel Interests "had acted in [a] bad faith or in an oppressive manner." (Arbitration Decision at 14.)

## ANALYSIS

Mr. Aggarao claims that, because of the arbiter's decision to apply Philippine law, he was deprived of the opportunity to vindicate U.S. general maritime rights and denied an adequate remedy. He argues that the arbiter's failure to address his legitimate interest in the enforcement of U.S. general maritime law empowers this court to refuse to recognize and enforce the arbitration award as violative of U.S. public policy.

Before the court may decide whether Mr. Aggarao's arbitration award violates public policy by depriving him of the opportunity to pursue the remedies to which he was entitled as a seafarer, it must establish what remedies were available to Mr. Aggarao under U.S. law. Accordingly, the court will first determine Mr. Aggarao's rights under U.S. general maritime law, and then determine whether he was able to effectively vindicate those rights during the arbitration proceedings in the Philippines.

### A.  Mr. Aggarao's Rights Under U.S. General Maritime Law

Mr. Aggarao argues that, under U.S. general maritime law, MOL and World Car are liable for maintenance and cure,[14] World Car is liable for the unseaworthiness of the vessel and its appurtenances, and Nissan is liable for negligence. As a threshold matter, the court determines that U.S. law is applicable to Mr. Aggarao's claims under a *Lauritzen-Rhoditis* analysis. Although the Supreme Court has acknowledged a "tendency" to apply the law chosen by parties under the terms of their contract, it has indicated that "a quite different result would follow if the contract attempted to avoid applicable law, for example, so as to apply foreign law

---

[14] Mr. Aggarao argues that both MOL and World Car are potentially liable for maintenance and cure as his employer and the shipowner, respectively. The Vessel Interests, however, argue that that World Car never had an obligation to provide maintenance and cure. The court need not decide this issue at this time. As explained below, the arbiter failed to decide any of Mr. Aggarao's claims against World Car.

to an American ship." *Lauritzen v. Larsen*, 345 U.S. 571, 588–89 (1953).  Here, Mr. Aggarao's POEA Contract attempts to apply Philippine law to a Liberian-flagged ship.  Thus, rather than simply apply the choice-of-law provision in Mr. Aggarao's contract, the court proceeds to the choice-of-law inquiry set forth by the Supreme Court for maritime injury cases.

Under the Supreme Court's *Lauritzen-Rhoditis* test, a court should consider: (1) the place where the acts causing the injury occurred; (2) the law of the flag; (3) the domicile or allegiance of the injured seafarer; (4) the allegiance of the shipowner; (5) the place of the contract of employment; (6) the inaccessibility of a foreign forum;[15] (7) the law of the forum; and (8) the shipowner's base of operations.  *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308–09 (1970); *see also Lauritzen*, 345 U.S. at 583–90.  This test "is not a mechanical one." *Rhoditis*, 398 U.S. at 308.  Indeed, "[p]erhaps the most venerable and [universal] rule of maritime law . . . is that which gives cardinal importance to the law of the flag." *Lauritzen*, 345 U.S. at 584; *see also Rhoditis*, 398 U.S. at 308 (stating that "the flag that a ship flies may, at times, alone be sufficient" to determine what law applies to a seafarer's claims); *Morewitz v. Andros Compania Maritima, S. A.*, 614 F.2d 379, 383 (4th Cir. 1980) (recognizing that the most important factor set forth in *Lauritzen* is the law of the flag).

Applying the *Lauritzen-Rhoditis* test to Mr. Aggarao's case, the court determines that: (1) Mr. Aggarao's injury occurred while the Asian Spirit was located in the Chesapeake Bay; (2) the Asian Spirit was flagged in Liberia, which adopts the general maritime law of the United

---

[15] It appears the inaccessibility of a foreign forum is relevant to a determination of forum non conveniens but not to a determination of choice of law.  *See Lauritzen*, 345 U.S. at 589–90 ("It is argued . . . that justice requires adjudication under American law to save seamen expense and loss of time in returning to a foreign forum.  This might be a persuasive argument for exercising a discretionary jurisdiction to adjudge a controversy; but it is not persuasive as to the law by which it shall be judged.").

States;[16] (3) Mr. Aggarao is a citizen of the Philippines; (4) the Asian Spirit was owned by World

Car, a Liberian corporation; (5) the POEA Contract was executed in the Philippines; (6) the law

of the forum is U.S. general maritime law; and (7) World Car's base of operations is in Liberia.

Five of the above factors favor the application of U.S. law, while only two factors favor the

application of Philippine law.  Most importantly, the law of the flag indicates that U.S. general

maritime law, as adopted by Liberia, should apply to Mr. Aggarao's claims.  Giving the law of

the flag great weight, as it is obligated to do, the court concludes that Mr. Aggarao's claims

should be governed by U.S. general maritime law.

Turning to a seafarer's right to maintenance and cure under U.S. general maritime law, as

explained by the Fourth Circuit,

> [A] seaman's fitness for repatriation is not determinative of his right to
> maintenance and cure; rather, the obligation to provide maintenance and cure
> persists until he "attains 'maximum cure,' defined as the point at which he is
> either cured or his condition is diagnosed as permanent and incurable." *Del.
> River & Bay Auth. v. Kopacz*, 584 F.3d 622, 632 (3d Cir. 2009); *Carleno v.
> Marine Transp. Lines, Inc.*, 317 F.2d 662, 665–66 (4th Cir. 1963) (holding
> maintenance and cure "is fulfilled when subsistence and medical care are
> furnished to the point where remedial medicine and surgery can do no more").
> Even in cases of permanent disability, maintenance and cure is required where
> palliative care would improve the seaman's condition.  *See In re RJF Int'l Corp.
> for Exon. from or Limitation of Liab.*, 354 F.3d 104, 107 (1st Cir. 2004).

*Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 377 n.22 (4th Cir. 2012).  The Fourth

Circuit further explained,

> . . . "[t]he obligation to pay maintenance and cure arises under maritime law
> whenever the seaman is injured, regardless of any negligence or fault on the part
> of the owner or employer." *Martin*, 560 F.3d at 221.  Moreover, any "ambiguities

---

[16] The maritime law of Liberia is set forth in Title 21 of the Liberian Code of Laws.  Section 30
states that: "Insofar as it does not conflict with any other provisions of this Title, the non-
statutory General Maritime Law of the United States of America is hereby declared to be and
hereby adopted as the General Maritime Law of the Republic of Liberia."  The Vessel Interests
do not dispute that Liberia adopts U.S. general maritime law, nor do they suggest any pertinent
conflict between Liberian and U.S. general maritime law.

or doubts" as to a seaman's right to receive maintenance and cure "are to be resolved in favor of the seaman." *Vaughn*, 369 U.S. at 532.  Otherwise, "[t]he shipowner's willful, arbitrary failure to pay maintenance and cure gives rise to damages that include a reasonable attorney's fee." *Williams v. Kingston Shipping Co., Inc.*, 925 F.2d 721, 723 (4th Cir. 1991).  Indeed, "[i]f the failure to give maintenance and cure has caused or aggravated an illness, the seaman['s] recovery in such circumstances include[s] not only necessary expenses, but also compensation for the hurt."  *Id.* (internal quotation marks omitted).

*Id.* at 378 n.23.

Applying the above principles here, even if Mr. Aggarao was fit for repatriation as of December 8, 2008, he was still entitled to maintenance and cure if he had not reached maximum cure or if palliative care would have improved his condition.  Any ambiguity as to Mr. Aggarao's right to maintenance and cure was to be resolved in his favor, and he was entitled to maintenance and cure regardless of whether MOL or World Car—assuming World Car may be held liable for maintenance and cure—acted negligently or were otherwise at fault.

In addition to seeking maintenance and cure, a seafarer may pursue claims for negligence and unseaworthiness.  *See Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 813 (2001) (citations omitted) ("It is settled that the general maritime law imposes duties to avoid unseaworthiness and negligence . . . [and] that nonfatal injuries caused by the breach of either duty are compensable . . . .").  In particular, a ship's time charterer may be held liable for its negligence in conducting activities as time charterer.  *See In re P & E Boat Rentals, Inc.*, 872 F.2d 642, 647 (5th Cir. 1989); *see also D.C. Chemical Co. Ltd. v. M/T ST. PETRI*, 654 F. Supp. 2d 574, 579 (S.D. Tex. 2009).  Likewise, the owner of the ship may be held liable for unseaworthiness when the condition of a ship or its appurtenances causes a seafarer's injury. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498–99 (1971) (explaining that a shipowner may be liable for unseaworthiness when, for example, "[h]er gear [is] defective, her appurtenances in disrepair, her crew unfit"); *see also Reed v. S. S. Yaka*, 373 U.S. 410, 414–15

17

(1963) ("[A] shipowner's obligation of seaworthiness cannot be shifted about, limited, or escaped by contracts or by the absence of contracts and . . . the shipowner's obligation is rooted, not in contracts, but in the hazards of the work.")  Thus, applying the above concepts here, U.S. general maritime law affords Mr. Aggarao potential causes of action against Nissan and World Car for negligence and unseaworthiness, respectively.

### B.  Mr. Aggarao's Arbitration Award Violates U.S. Public Policy

Mr. Aggarao next claims that the arbiter's decision failed to address the Vessel Interests' accountability for maintenance and cure, negligence, and unseaworthiness.  The court's role in reviewing a foreign arbitration award is limited.  *See Int'l Trading and Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011); *see also Ministry of Def. and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1098 (9th Cir. 2011) (indicating that there is a strong public policy favoring confirmation of foreign arbitration awards); *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 316 (2d Cir. 1998) (stating that, under the Convention, "an arbitration award cannot be avoided solely on the ground that the arbitrator may have made an error of law or fact").  Pursuant to 9 U.S.C. § 207, "[t]he court shall confirm [a foreign arbitration] award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention."  Article V(2)(b) of the Convention specifies that "[r]ecognition and enforcement of an arbitral award may . . . be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . recognition or enforcement of the award would be contrary to the public policy of that country."  *See Europcar Italia, S.p.A.*, 156 F.3d at 315 (explaining that the public policy exception is to be construed narrowly).

The Supreme Court's decisions in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), and *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995), taken together, establish the "prospective waiver doctrine," discussing when the court may deny enforcement of an arbitration award as violative of public policy.  In *Mitsubishi*, the Court deemed enforceable an arbitration clause requiring the parties to arbitrate claims arising under the Sherman Act in Japan.  473 U.S. at 616–24, 628–29.  Although it was clear that U.S. law was to apply during arbitration, the Court observed in a footnote that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."  *Id.* at 637 n.19.  The Court in *Sky Reefer* narrowed the prospective waiver doctrine, clarifying that a prospective waiver violates U.S. public policy only when there is "no subsequent opportunity for review" in federal court.  *Sky Reefer*, 514 U.S. at 540; *see also Aggarao*, 675 F.3d at 371.

Following *Mitsubishi* and *Sky Reefer*, there was some confusion as to when the court may consider the prospective waiver doctrine.  *Compare Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257 (11th Cir. 2011), *with Thomas v. Carnival Corp.*, 573 F.3d 1113 (11th Cir. 2009).  There are two stages to arbitration-related court proceedings: (1) the arbitration-enforcement stage, "when a district court is considering an action or motion to refer the parties to arbitration," and (2) the award-enforcement stage, "after an arbitration award has been made and the court is considering whether to recognize and enforce an arbitral award."  *Aggarao*, 675 F.3d at 372 (citations and internal quotation marks omitted).  As explained by the Fourth Circuit, *Mitsubishi* and *Sky Reefer* allow the plaintiff to assert his prospective waiver argument at the award-enforcement stage.  *Id.* at 373.  Thus, once an arbitration award is made, the court may consider

whether the award adequately addressed the plaintiff's interest in the enforcement of U.S. laws. *Id.* at 371–73; *see also Mitsubishi*, 473 U.S. at 638 ("While the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the [relevant] claims and actually decided them.").[17]

In *Asignacion v. Schiffahrts*, Nos. 13-0607, 13-2409, 2014 WL 632177 (E.D. La. Feb. 10, 2014),[18] the district court applied *Mitsubishi* and *Sky Reefer* to consider whether a Philippine arbitration award violated U.S. public policy. The plaintiff in *Asignacion*, a Filipino citizen, was injured aboard a vessel owned by a German corporation and flagged in the Republic of the Marshall Islands. *Id.* at *1. He was working aboard the ship as it was docked in the Port of New Orleans, when a cascade tank in the engine room overflowed and splashed him with scalding water. *Id.* Although the plaintiff was initially treated in Louisiana, he was eventually repatriated to the Philippines to receive continued medical attention. *Id.*

The plaintiff filed suit in state court to recover for his injuries pursuant to U.S. general maritime and statutory law. *Id.* at *2. The state court, however, stayed the proceedings and, based on the plaintiff's POEA Contract, ordered arbitration to commence in the Philippines. *Id.* The arbitral panel eventually found "that United States law would not be applied, that Philippine law controlled and accordingly, that Plaintiff was entitled only to scheduled benefits based on his level of disability resulting in an award of $1,870.00." *Id.* Following this decision, the plaintiff filed a motion in state court, requesting an order that the defendant show cause as to why the stay

---

[17] The Supreme Court in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), later reaffirmed its desire to prevent "the prospective waiver of a party's right to pursue statutory remedies." *See id.* at 2310–11 (emphasis omitted) (quoting *Mitsubishi*, 473 U.S. at 637 n.19).

[18] Unpublished opinions are cited not as precedent but for the persuasiveness of their reasoning.

should not be lifted and why the arbitration decision should not be set aside as violative of U.S. public policy.  *Id.*  The defendant removed the action to federal district court and filed a motion for the district court to recognize and enforce the Philippine arbitration award.  *Id.*

The district court, deciding that U.S. general maritime law applied to the plaintiff's claims,[19] noted that the arbitral panel refused to consider his claims for maintenance and cure, negligence, and unseaworthiness.  *Id.* at *7.  Nor did the panel consider "any evidence pertaining to Plaintiff's lost wages and medical expenses or the moral and compensatory damages and punitive damages to which he had a right to seek."  *Id.* at *8.  The court, therefore, determined that the arbitration decision did not address the plaintiff's legitimate interest in the enforcement of U.S. general maritime law; it did not take cognizance of his claims and actually decide them. *Id.*  Concluding that this constituted a violation of public policy, the court explained that it was not the arbitral panel's failure to apply U.S. law—nor its decision to apply Philippine law—that gave rise to such a violation.  *Id.* at *9–10.  Rather, it was "the effective denial of Plaintiff's opportunity to pursue the remedies to which he was entitled as a seaman that resulted from the panel's application of Philippine law.  Had the panel applied a set of foreign laws which

---

[19] The court noted that the choice-of-law question is to be decided in the first instance by the arbiter, but moved on to conduct its own choice-of-law analysis.  *Id.* at *5.  Applying the *Lauritzen-Rhoditis* test, the court determined that:

> (1) Plaintiff's injury occurred while the vessel was located in the United States; (2) the vessel flew the flag of the Marshall Islands; (3) Plaintiff is a resident and citizen of the Philippines; (4) the vessel was owned by Defendant, a German corporation; (5) the contract between the parties was executed in the Philippines; (7) the law of the forum is United States maritime law; (8) Defendant's base of operations is in Germany, its principal place of business.

*Id.* at *6.  The court reasoned that "great weight" is to be given to the law of the flag, and decided to apply the law of the Marshall Islands, which have adopted the general maritime law of the United States.  *Id.* at *6–7.

provided a basis for pursuing similar rights and protections, public policy would have been satisfied." *Id.* at *10.  Accordingly, the court refused to enforce the arbitration award.  *Id.*

Like the plaintiff in *Asignacion*, Mr. Aggarao was denied the opportunity to pursue the remedies to which he was entitled as a seaman and, as a result, was deprived of an adequate remedy.  First, Mr. Aggarao was unable to effectively vindicate his claim for maintenance and cure.  The Fourth Circuit has made clear that "a seaman's fitness for repatriation is not determinative of his right to maintenance and cure."  *Aggarao*, 674 F.3d at 377 n.22.  Rather, a seafarer is entitled to maintenance and cure until he achieves maximum cure, "'defined as the point at which he is either cured or his condition is diagnosed as permanent and incurable.'"  *Id.* (quoting *Kopacz*, 584 F.3d at 632).  Moreover, even when the seafarer is permanently disabled, "maintenance and cure is required where palliative care would improve [his] condition."  *Id.* The arbiter in Mr. Aggarao's case, however, made absolutely no attempt to ascertain whether he had reached maximum cure, or whether he would benefit from palliative care.[20]  Instead, finding that Mr. Aggarao was fit for repatriation, she decided that he had no right to maintenance and cure.

Despite the arbiter's finding, there were—and are—serious questions as to whether repatriation was in Mr. Aggarao's best interest and whether he would receive adequate medical

---

[20] The record before the court strongly suggests that Mr. Aggarao would benefit from palliative care.  He anticipates that he will need surgery on the abdominal hernia that developed around the site of the colostomy, and claims to need "proper braces, a good wheel chair and related equipment, physical therapy, medications for neuropathic pain, spasms, insomnia, depression, DVT suppression, pulmonary embolisms, constipation, chronic urinary infections, decubitus ulcers and osteomyelitis, most of which are life-threatening problems." (Aggarao's Mot. to Vacate, ECF No. 133, at 40.)  These claims find support in Mr. Aggarao's recent supplemental filings, which detail, *inter alia*, hospitalizations, diagnoses of recurrent pulmonary embolisms, decubitis ulcers, urinary tract infections, and kidney infection, and complaints of continued pain. Moreover, the Vessel Interests concede that Mr. Aggarao needs a number of medical implements and medications.  (*See* Vessel Interests' Supp. Answers, Ex. 23, ECF No. 132-30, at 4–5.)

care in the Philippines.  The arbiter pointed to a paralegal's hearsay declaration to find that Mr.

Aggarao was ready for repatriation as of December 2008.  (*See* Arbitration Decision at 13

("[C]omplainant was . . . certified by a United States doctor and a physical therapist to be ready

for repatriation to the Philippines . . . .").)  Moreover, the arbiter would only consider the medical

assessment of Dr. Alegre, the company-designated physician, which is entirely at odds with the

assessments provided by Dr. Scalea, the physician who has treated Mr. Aggarao since the day of

his accident, Dr. Bonfiglio, and Elizabeth Davis, RN.  (*See* Mar. 10, 2009, Scalea Letter, at 1 ("I

believe it is in Mr. Aggarao's best interest to remain in the United States to have the procedures

[for abdominal reconstruction] done at the Shock Trauma Center. . . .  I believe that optimal

results will occur if he is cared for in an institution that knows him inside and out."); Apr. 19,

2010, Bonfiglio Rep., at 5 ("I would strongly advocate that he not be deported for the complexity

of his current medical condition would likely lead to his premature death, if he is forced from the

United States.  He would not be able to receive the level of medical care that he needs in other

countries, especially the Philippines."); Feb. 1, 2010, Davis Rep., Ex. 12VV, ECF No. 132-16

(finding that it is "unsafe" for Mr. Aggarao to be repatriated to the Philippines).)  Finally, Mr.

Aggarao's medical records, including those contained in his recent supplemental filings, show

that since December 2008 he has been repeatedly hospitalized for surgical procedures and

related, serious complications.

Even assuming that Mr. Aggarao was fit for repatriation at some point in time, the Vessel

Interests have made no promise as to what, if any, medical care he would receive upon his return

to the Philippines.  Mr. Aggarao has asked the Vessel Interests whether they would provide him

with certain medical implements, medications, and therapy upon his return to the Philippines;

they have not committed to doing so.  Instead, the Vessel Interests have stated that they "will

provide [Mr. Aggarao] with medical attention in accordance with their obligations under the [POEA] Contract . . . ."  (Vessel Interests' Supp. Answers at 2–3.)  But Section 20(B)(2) of the POEA Contract only obligates the Vessel Interests to provide medical care "until such time as [the seafarer] is declared fit or the degree of his disability has been established by the company-designated physician."  (POEA Contract at 2.)  The court cannot conclude that Mr. Aggarao would receive adequate medical care in the Philippines, when the Vessel Interests may completely cut off assistance to him whenever their designated physician gives the word.  *Cf. Aggarao*, 675 F.3d at 378–79.

Nor was Mr. Aggarao able to effectively vindicate his negligence and unseaworthiness claims against Nissan and World Car, respectively.  Under Philippine law, Mr. Aggarao was only entitled to benefits based on his Grade 1 disability.  Thus, after determining the amount of disability benefits to which Mr. Aggarao was entitled under the POEA Contract, the arbiter found that he could not make any claim for damages against Nissan or World Car.  (*See* Arbitration Decision at 11 ("The fact remains that [Mr. Aggarao] filed a claim for disability compensation under the POEA Contract and this bars him from claiming any other forms of damages.").)  The arbiter simply did not consider, nor did Philippine law allow her to consider, Mr. Aggarao's claims against Nissan and World Car.[21]

The Vessel Interests argue that the public policy exception is not satisfied simply because the remedies available under foreign law are less favorable than U.S. legal remedies.  While the court agrees with this statement, that is not the basis for today's decision.  As in *Asignacion*, the

---

[21] In deciding that Mr. Aggarao could not recover for loss of earning capacity, the arbiter made the sweeping statement that he "failed to present evidence on the alleged negligence of respondents."  (Arbitration Decision at 9.)  She did not, however, explain what duties Nissan owed as the time charterer, or what would constitute a violation of those duties.  Without any explanation as to why Mr. Aggarao failed to meet his burden, the court cannot conclude that the arbiter took cognizance of his claim and actually decided it.  *See Mitsubishi*, 473 U.S. at 638.

arbiter did not simply provide less favorable remedies than those available under U.S. law: she

provided no such remedies.  The POEA Contract destroyed Mr. Aggarao's right to maintenance

and cure, and cut off any potential cause of action against Nissan and World Car.  In limiting Mr.

Aggarao's remedies to those allowed by the POEA Contract, the arbiter transgressed this

country's strong and longstanding policy of protecting injured seafarers and providing them

special solicitude.  *See, e.g.*, *Am. Export Lines, Inc. v. Alvez*, 446 U.S. 274, 285 (1980) (quoting

*Moragne v. States Marine Lines*, 398 U.S. 375, 387 (1970)) (explaining that "[a]dmiralty

jurisprudence has always been inspirited with a 'special solicitude for the welfare of those men

who under[take] to venture upon hazardous and unpredictable sea voyages'"); *see also*

*Asignacion*, 2014 WL 632177, at *9.  Accordingly, the court will not recognize or enforce Mr.

Aggarao's arbitration award.[22]

## CONCLUSION

For the reasons set forth above, Aggarao's motion will be granted, and the Vessel

Interests' motion will be denied.  A separate order follows.


August 7, 2014                                    _____/s/_____
Date                                              Catherine C. Blake
                                                  United States District Judge

---

[22] Because the court concludes that the arbitration award violates U.S. public policy, it need not reach Mr. Aggarao's other arguments that the arbitration award decides matters beyond the scope of arbitration or not capable of settlement by arbitration, violates due process, and displays a "manifest disregard for the law."